Middleton, J.
The sole issue is whether the evidence justified the issuance of a certificate of public convenience and necessity to O. F. Leinard to transport property in intrastate commerce over irregular routes from and to Carryall township, Paulding county. If the evidence did not establish public convenience and necessity, the order of the Public Utilities Commis *80 sion granting the certificate is unreasonable and unlawful and should be reversed.
In the case of D. G. & O. Truck Lines, Inc., v. Public Utilities Commission, 158 Ohio St., 564, decided by this court February 11, 1953, the fundamental principle is again announced that “necessity” for motor transportation service as contemplated by the Motor Transportation Act is not synonymous with “convenience” or alternative thereto, and that the provision, that the Public Utilities Commission must find “convenience and necessity” as a prerequisite to the issuance of a certificate to a motor transportation company to transport property over the highways of this state, requires evidence of a definite need of the public for such transportation service. It may be added to that statement that the burden of proving such public need is upon the applicant for the certificate.
At the hearing on the application now under consideration, five witnesses were presented by the applicant. One was Leinard himself. He told of the success of the Development Corporation of Antwerp, of which he, as vice-president, was the active head, in its efforts to induce the Weatherhead Company to locate a factory just east of Antwerp. He predicted that the operation of that factory would increase transportation needs. He stated that he then owned three available trucking units. He admitted that he knew of no inquiries made by Antwerp Development Corporation as to what transportation facilities were already available to Antwerp and he offered no testimony with respect to the services rendered by or made available by Mohawk Motor, Inc. His testimony revealed that the Weatherhead factory was not then completed and no part of it was in operation, and that he did not know what commodities would be manufactured by that company when the factory was completed.
*81 The second witness was an industrial consultant from Columbus whose testimony consisted of a general discussion of the increase in employment usually resulting from new factories and the consequent benefits to a community. Such activity, he concluded, would increase the amount of trucking. He knew nothing with respect to the transportation facilities already furnished to Antwerp.
The third witness was an insurance agent located in Antwerp who was secretary of Antwerp Development Corporation. He related that $30,000 was raised by the citizens and was contributed to the Weather-head Company to induce it to locate at Antwerp. He did not undertake to discuss the transportation facilities already available and on cross-examination stated positively that he had no knowledge as to whether existing facilities could handle the Weatherhead business.
The fourth witness was the industrial relations attorney of the Weatherhead Company with offices in that company’s headquarters at Cleveland. He described to some extent the kinds of freight which had to be transported generally for the Weatherhead Company, naming Cleveland as a principal point of origin and naming Lockland, near Cincinnati, and Dayton as important points to which the Weatherhead Company products moved. He stated that if Leinard received a certificate the Weatherhead Company would route shipments in Leinard’s trucks both into and out of Antwerp. He testified also that the Weather-head Company uses the services of Mohawk Motor, Inc., and he made no complaint with respect to the services of that company. In answer to the question, “Do you know whether existing carriers already authorized to do that job can or can not do it as of right now?,” he answered, “I have no reason to believe *82 that they cannot. ’ ’ In answer to another question, he stated that Mohawk had been “doing a pretty good job.” He had made no investigation to determine what service Mohawk gave to the Antwerp area. He did not know what service Mohawk gave to Dayton, Dockland and Cincinnati but he said, “I presume they are good.” He had had no experience with any of the carriers failing to give service in connection with the Antwerp plant.
The fifth witness for the applicant was interested in a local elevator organization which he said contemplated building a new elevator. He did not undertake to testify with respect to the trucking requirements of Antwerp or with respect to the adequacy of present trucking facilities.
At this point the applicant rested. The applicant presented no evidence as to the volume of freight available in Carryall township, except the prediction that the Weatherhead plant would probably produce some undetermined and unestimated volume of some kind of goods for transportation. There was no evidence that the community was not being adequately served by certificated carriers and no suggestion that those carriers would be unable to satisfactorily handle all freight reasonably anticipated. Upon the record so made there was no showing of public necessity as required to justify the issuance of a certificate to the applicant.
Mohawk Motor, Inc., then presented the testimony of its vice-president in charge of operations. He testified to the location of the Weatherhead Company’s factory on state highway No. 24; that Mohawk held a certificate for regular operation over that highway; that Mohawk served all the locations which had been named as points of origin or destination with respect to Weatherhead shipments; that Mohawk operated *83 about 330 pieces of equipment; that it was equipped to handle all the business which could be furnished by the Weatherhead Company at Antwerp; and that it needed the business which might be furnished by the Weatherhead Company at its Antwerp factory, particularly because operations through Antwerp in the past had been carried on at a loss. He testified that Mohawk trucks passed through Antwerp regularly several times a week, that from January 1, 1951, to the date of the hearing (June 14, 1951) his company did not handle one ton of outbound freight from Antwerp, and that it handled inbound to Antwerp 239 shipments with a total tonnage of 142,131 pounds — all of them being relatively small shipments. He testified further that the natural flow of truck traffic was from east to west, which made it necessary for his company to operate trucks light to the east from its Bryan, Ohio, headquarters every day of the week. Those trucks could be utilized for eastbound traffic from the Weatherhead Company’s Antwerp plant.
If there was any question in the mind of the examiner at the close of the evidence offered by the applicant, it should have been dispelled by the affirmative testimony of the vice-president of Mohawk Motor, Inc., above outlined. This brings into bold relief the following statement contained in the examiner’s report, “The commission has somewhat generally taken the position that a community is entitled to both regular and irregular route service.” Considering the character of evidence presented it must be assumed that the commission’s finding of public convenience and necessity resulted from the application of the theory expressed in the statement above quoted from the examiner’s report. There is no legal sanction for such theory or the adoption of a practice based upon it. Reference is again made to the decision of this court in D. G. & U. Truck Lines, Inc., v. *84 Public Utilities Commission, supra, where it is held that “an order of the Public Utilities Commission granting such application on the ground that each community is entitled, as a matter of policy, to both a regular and irregular certificated service is in disregard of the established public policy of this state that no more motor trucks or busses be placed on the public highways than the public necessity requires and is unreasonable and unlawful.”
The evidence in the instant case did not justify a finding of public convenience and necessity and did not justify the issuance of a certificate to O. F. Leinard for the transportation of property over irregular routes from and to Carryall township, Paulding county, Ohio.
The order of the Public Utilities Commission is reversed.

Order reversed.

Weygandt, C. J., Tart, Matthias, Hart, Zimmerman and Stewart, JJ., concur.